Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
Andrew J. Somers, #19078
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com
andrew@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ROMAN K., and C.K., <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, the ADMINISTRATIVE COMMITTEE OF DELTA AIRLINES, INC., and the DELTA ACCOUNT-BASED HEALTHCARE PLAN, <br><br> Defendants. | COMPLAINT |

Plaintiffs Roman K. ("Roman") and C.K., through their undersigned counsel, complain and allege against Defendants United Healthcare Insurance Company, United Behavioral Health (collectively "United"), the Administrative Committee of Delta Airlines, Inc. ("the Plan Administrator") and the Delta Account-Based Healthcare Plan ("the Plan") as follows:

//

1

## PARTIES, JURISDICTION AND VENUE

1.  Roman and C.K. are natural persons residing in DeKalb County, Georgia. Roman is C.K.'s father.

2.  United Healthcare Insurance Company is headquartered in Hennepin County, Minnesota and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case. United Behavioral Health is the mental health arm of United Healthcare Insurance Company.

3.  Until December 31, 2022, United acted as agent for the Plan and the Plan Administrator, after which it ceded its third-party administrative duties to another insurer.

4.  The Plan Administrator is the designated administrator for the Plan.

5.  The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Roman was a participant in the Plan and C.K. was a beneficiary of the Plan at all relevant times.

6.  C.K. received medical care and treatment at First Light Wilderness Therapy ("First Light") from February 24, 2022, to June 8, 2022. First Light is an outdoor behavioral healthcare program in Georgia which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

7.  United denied claims for payment of C.K.'s medical expenses in connection with his treatment at First Light.

8.  This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9.  Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because United does

business in Utah and the appeals and claims in this case were sent to United's Salt Lake City facility for processing. In addition, the plan sponsor, Delta Airlines, has significant business operations in Utah and the Plan Administrator also carries out significant business on a daily basis in Utah.

10. In addition, the Plaintiffs have been informed and reasonably believe that litigating the case outside of Utah will likely lead to substantially increased litigation costs they will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

11. The remedies the Plaintiffs seek under the terms of ERISA and the Plan are for the benefits due under the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), for an award of statutory damages against the Plan Administrator pursuant to 29 U.S.C. §1132(c) based on the failure of the Plan Administrator and its agents, to produce within 30 days documents under which the Plan was established or operated, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### C.K.'s Developmental History and Medical Background

12. C.K. was adopted by Roman shortly after his birth. While it was never definitively confirmed, it was suspected that C.K.'s biological mother used drugs while pregnant with him.

13. C.K. was extremely energetic and impulsive which made it difficult for him to socialize with other children. C.K.'s kindergarten teacher called Roman in for a meeting to tell him that she had never seen a child with that much energy in 22 years of teaching and that C.K.'s disruptive behaviors were making it difficult for her to do her job.

14. C.K. was diagnosed with ADHD and started meeting with a psychiatrist. C.K. also started taking multiple medications. He was placed into the gifted program after Roman suspected that part of his energy issues was due to boredom. C.K. continued to have difficulty making and keeping friends due in large part to his excessive hyperactivity.

15. C.K. was given a Section 504 plan and continued to receive regular outpatient treatment. C.K. started vaping when he was in the seventh grade and began exhibiting anger issues. C.K. was also the victim of a rape around this time. C.K. also began spending an inordinate amount of time online and was discovered to be self-harming by cutting. C.K.'s social problems were compounded due to the isolation which came with the Covid-19 pandemic.

16. C.K. started engaging in risky sexual behaviors and would often sneak out and abuse substances with others. In September of 2021, he had to go to the hospital after he had a reaction to some marijuana he was vaping. C.K. also snuck alcohol into school. C.K. was frequently bullied, and on one occasion he was assaulted in the school restroom. The decision was then made to withdraw him from school.

17. Despite continued treatment and medication, C.K. continued to self-harm and had frequent thoughts of suicide. C.K.'s treatment team recommended more intensive interventions and he was admitted to a partial hospitalization program. C.K. was only at

the program for a week before he was asked to leave after exhibiting inappropriate

behaviors towards female patients. He then was admitted to First Light.

### First Light Treatment

18. C.K. was admitted to First Light on February 24, 2022.

19. In a letter dated February 28, 2022, United denied payment for C.K.'s treatment. The

letter gave the following justification for the denial:

> We've denied the medical services/items listed below requested by you or your
> provider: Mental Health Wilderness Therapy as of 02/24/2022 forward.
>
> You are being treated for concerns with mood.
>
> The request was reviewed. We have denied the medical services requested
> because
>
> We talked to your provider's designee. The criteria are not met because:
>
> Wilderness program is considered unproven.

20. On August 23, 2022, C.K.'s mother ("Angela") submitted an appeal of the denial of

payment for C.K.'s treatment. Angela wrote that she was entitled to certain protections

under ERISA during the appeal process, including a full, fair, and thorough review

conducted by appropriately qualified reviewers whose identities were clearly disclosed,

which took into account all of the information she provided, and which gave her the

specific reasons for the adverse determination, referenced the specific plan provisions on

which the denial was based, and which gave her the information necessary to perfect the

claim.

21. She asked that the reviewer be knowledgeable about generally accepted standards and

clinical best practices for outdoor behavioral health programs in the state of Georgia

where First Light was located, and that they be trained in the details of MHPAEA to appropriately respond to her allegations concerning a violation of the statute.

22. Angela argued that wilderness programs like First Light were not experimental and should have qualified as covered services under the terms of the Plan. She pointed out that First Light was licensed by the State of Georgia as an Outdoor Child Caring Program.

23. Angela stated that she did encounter language in her benefits booklet which stated that some programs such as wilderness, ranch, or residential academic programs "are generally not a Covered Service," however she noted that she was unable to find anywhere in her benefits booklet where United defined what constituted a "wilderness program" and whether that included licensed facilities such as First Light.

24. She noted that United's Optum guidelines appeared to conflate outdoor behavioral health programs with scout camps and boot camps which were not intended to offer any sort of therapeutic value.

25. She argued that First Light did meet the requirements listed in her benefits booklet to qualify as a covered service. She wrote that the treatment C.K. received was offered in accordance with generally accepted standards of medical practice and was tailored to treat C.K.'s mental health conditions.

26. Angela wrote that apart from United's declaration that wilderness programs were experimental and "generally not" covered– an exclusion which she alleged did not even actually apply to the treatment C.K. received at First Light– no other exclusion in the terms of the Plan could be construed as applying to First Light.

27. Angela stated that she had also come across a wilderness therapy policy developed by United subsidiary Optum, however she contended that if this policy had been used it should not have been, as it both said that it was superseded by the terms of the member's individual benefit plans and that it was intended to apply to services billed under codes T2036, and T2037. She stated that the services at First Light were billed under code 1006 and should not have been denied under the wilderness criteria.

28. Angela further quoted the definition of experimental, investigational, and unproven services in her benefits booklet and argued that it appeared not to apply to the services C.K. received. She wrote that outdoor behavioral health programs had been the subject of extensive trials and peer reviewed articles which showed that they were a proven and effective treatment. Angela included a subset of these research articles, attesting to the proven and beneficial nature of outdoor behavioral health programs.

29. She wrote that after extensive review the American Hospital Association and the National Uniform Billing Committee had developed the 1006 revenue code for outdoor behavioral health programs. She argued that outdoor behavioral health programs would not have been given this code or be licensed by state regulators if they were determined to be experimental.

30. Angela included a letter from Dr. Michael Gass, an expert in the field. Dr. Gass made numerous critiques of the Optum wilderness policy and argued that the outdoor behavioral health programs of today which were licensed and accredited and offered proven treatment methods, were a far cry from wilderness camp programs "which rely heavily on punishment, confrontation, and deprivation."

31. Dr. Gass contended that outdoor behavioral health treatment programs were effective and safe and that studies had found that adolescents who took part in outdoor behavioral health programs led to a significant decrease in symptoms, especially compared to traditional community-based treatment.

32.  Angela also included letters of medical necessity from various independent review organizations which stated among other things that "this mode of treatment is no longer an experimental treatment" with "a significant body of literature establishing its appropriateness."

33. Angela contended that the denial of payment for C.K.'s treatment was a violation of MHPAEA. She wrote that MHPAEA compelled insurers to ensure that coverage for mental health services was offered at parity with coverage for analogous medical or surgical services.

34. Angela identified skilled nursing, subacute rehabilitation, and inpatient hospice facilities as some of the medical or surgical analogues to the treatment C.K. received.

35. She argued that United was imposing restrictions on outdoor behavioral health programs through disparate implementation of experimental and investigational treatment restrictions as well as restrictions on facility type or provider specialty. She expressed doubt that United denied payment for services in a skilled nursing, rehabilitation, or hospice facility because the facilities were deemed to be experimental or investigational.

36. She further stated that United claimed that wilderness programs "are generally not a Covered Service" even though C.K.'s treatment appeared to meet all the requirements in her benefits booklet to qualify as a covered service. She asked United to perform a parity

compliance analysis on the Plan and to provide her with physical copies of the results of

this analysis.

37. In addition Angela asked to be provided with a copy of all documents under which the

Plan was operated, including all governing plan documents, the summary plan

description, any insurance policies in place for the benefits she was seeking, any

administrative service agreements that existed, any clinical guidelines or medical

necessity criteria utilized in the determination (along with their medical or surgical

equivalents, whether or not these were used), together with any reports or opinions

regarding the claim from any physician or other professional, along with their names,

qualifications, and denial rates (collectively the "Plan Documents").

38. In a letter dated September 23, 2022, United upheld the denial of payment for C.K.'s

treatment. The reviewer gave the following justification for the denial:

> We've denied the medical services/items listed below requested by you or your
> provider: Mental Health Wilderness Therapy as of 02/ 24/2022.
>
> You were being treated for concerns with mood.
>
> The request was reviewed. We have denied the medical services requested
> because
>
> We reviewed the case notes and medical records. The criteria are not met because:
> Wilderness program is considered unproven.
>
> Care and recovery could continue in the Mental Health Residential Treatment
> setting consistent with Child and Adolescent Service Intensity Instrument.
>
> The Guideline used for the decision is:
> Optum Behavioral Clinical Policy for Wilderness Therapy.

39. On January 3, 2023, Angela submitted a level two appeal of the denial of payment for

C.K.'s treatment. Angela argued that United had failed to abide by its obligations under

ERISA. She asserted that United had failed to meaningfully respond to her arguments,

including her contention that it was in violation of MHPAEA. She wrote that United had given no indication that it had performed a MHPAEA compliance analysis as she had requested, nor had it provided her with the documentation she asked for.

40. She contended that United had failed to conduct a full and thorough review of her case, and had not made any references to any of the 28 exhibits she included in the appeal, nor had it made any attempt to address her arguments that wilderness programs were proven and effective, or that the Optum policy United continued to use was inapplicable and intended for other services with different revenue codes.

41. She wrote that C.K.'s treatment was consistent with the CASII guidelines United referenced in its denial letter, and asked United to specify exactly which provisions it alleged C.K. failed to meet. She also expressed concern that United's reviewer wasn't appropriately qualified.

42. She again contended that outdoor behavioral health programs were not experimental or investigational and included additional documentation to that effect, including another letter from Dr. Michael Gass. Angela also submitted letters of medical necessity from C.K.'s treatment providers attesting to the necessity of his treatment. She again asked for a copy of the Plan Documents.

43. In a letter dated February 3, 2023, United upheld the denial of payment for C.K.'s treatment. The letter attributed the denial to:

> The noncoverage determination for mental health residential care will be upheld on 02/24/2022 and forward.
>
> In addition, from 03/18/2022 forward, this facility is not available for authorization due to: service components do not match mental health inpatient (IP)/ residential treatment center (RTC)/ partial hospital program (PHP)/ intensive outpatient (IOP) as outlined in child and adolescent service intensity instrument (CASIl) criteria.

44. On March 7, 2023, Angela asked for the denial of payment to be evaluated by an external review agency. Angela continued to argue that C.K.'s treatment was a covered benefit and that she would not have willingly taken on the emotional heartache and financial burden of treatment if it wasn't effective. She included her level one and level two appeals as attachments and asked the reviewer to carefully this information.

45. In a letter dated April 24, 2023, the external review agency upheld the denial of payment for C.K.'s treatment at First Light. The unidentified reviewer wrote in pertinent part:

> The patient is a 17 year old male with major depression, anxiety and ADHD (attention deficit hyperactivity disorder) admitted to residential treatment in a wilderness program. He presented with symptoms of worsening depressed mood, anger, poor impulse control, difficulty in interpersonal relationships with peers and in daily functioning. Prescribed medications included Prozac, Ability, guanfacine and Vyvanse. Dates of service 2/24/22-5/31/22 are under review.
>
> The appeal letter from the patient's psychiatric nurse practitioner stated that she recommended referral to a wilderness program in 2021 due to the patient's symptoms worsening despite outpatient treatment. She has been providing treatment to the patient since 2018. However, there was no indication that the patient had tried and failed treatment in either IOP (intensive outpatient program) or PHP (partial hospitalization program) settings prior to the referral.[1]
>
> The patient's mother's appeal letter stated that although the First Light center is not a residential treatment center, she considers that it is an "intermediate, impatient behavioral health program...similar to the intensity of services often found in residential treatment center settings", and her belief that "outdoor behavioral health programs are not experimental". However, in the current standard of care, the use of wilderness treatment programs in the mental health treatment of children and adolescent patients with mental health conditions, at this time, continues to be the subject of ongoing research and study in order to determine if it is clinically effective as well as safe for these patients. Concerns

---

[1] This statement suggests the reviewer did not fully examine the appeal materials that were submitted, as these materials communicated that C.K. did in fact receive treatment at the partial hospitalization level prior to the referral but was asked to leave due to his predatory behaviors toward female residents. See paragraph 17 above. Moreover, to the extent that asserted failure to obtain treatment in an IOP or PHP setting formed the bases for the reviewer's opinion that the treatment was not covered, this is a "fail-first" rationale for denial that violates MHPAEA.

have been raised about safety in these programs, as they involve outdoor adventure-type programs and activities, due to reported death/injuries in some instances.

The medical literature recommends treatment of children and adolescents in the least restrictive setting (Dulcan, 2016). Residential care is considered appropriate only for cases of severe mental health symptoms which cannot be safely managed in an intensive ambulatory setting (MCG, 2022), and the use of wilderness programs is not part of societal guideline recommendations (AACAP, 2007). Wilderness programs are not widely accepted as proven and effective within the organized medical community, and so would meet the Plan definition of experimental, investigational, and unproven treatment.

Therefore, based on the submitted records, current medical literature, and standard of care as supported by societal guidelines, the requested Residential Mental Health Wilderness Therapy, dates of service 02/24/2022 through 05/31/2022, is unproven and is not supported as medically necessary.

46. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

47. As Roman and Angela had not received the documentation they requested despite numerous attempts, they made one last attempt at procuring these materials by sending the request directly to the Plan Administrator. In a letter dated April 14, 2024, they specifically asked to be provided with:

- Disclosure of the identities of all individuals with clinical or medical expertise who evaluated the treatment for my son, [C.K.], at First Light Wilderness Therapy …., copies of those individuals' *curriculum vitae*, copies of any memoranda, emails, reports, or other documents reflecting the rationale of the reviewers in denying coverage for [C.K.]'s claim;
- A complete copy of both the medical necessity criteria utilized by Optum/United Behavioral Health in determining that [C.K.]'s treatment was not medically necessary and that treatment for him at a lower level of care was appropriate;
- A complete copy of the medical necessity criteria utilized by the Plan for skilled nursing facilities, sub-acute inpatient rehabilitation treatment, and inpatient hospice treatment. This is necessary to allow me to carry out an evaluation of whether the Plan has complied with the requirements of the federal Mental Health Parity and Addiction Equity Act;
- Copies of documents identifying the self-compliance analysis the Plan and Optum/United Behavioral Health have carried out to determine the extent to which they are complying with the federal Mental Health Parity and Addiction Equity Act.

- Complete copies of any and all internal records compiled by Optum/United Behavioral Health and Delta Airlines in connection with [C.K.]'s claim including, but not limited to, telephone logs, memoranda, notes, emails, correspondence, or any other communications;
- A copy of the summary plan description, master plan document, certificate of insurance, insurance policy, and any other document under which [C.K.]'s insurance plan is operated;
- Copies of any and all administrative service agreements, contracts or other documents which described and defined the relationship, rights and obligations of and between you, the plan administrator, and Optum/United Behavioral Health; and
- Copies of any and all documents outlining the level of accreditation required for residential treatment programs;
- Copies of any and all documents showing whether analogous levels of care to residential treatment programs also require these levels of accreditation; and
- Copies of documents identifying the process, strategies, evidentiary standards, or other factors the Plan used to determine that the treatment at First Light Wilderness Therapy …. was experimental and investigational.
- Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to determine whether treatment at sub-acute inpatient programs for medical or surgical treatment is experimental and investigational.
- Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.

48. United and the Plan Administrator received the letters on April 22nd and 23rd, respectively, but Roman and Angela have not yet received a response to this request or their other requests for documentation.

49. The denial of benefits for C.K.'s treatment was a breach of contract and caused Roman to incur medical expenses that should have been paid by the Plan in an amount totaling over $65,000.

## **FIRST CAUSE OF ACTION**

### **(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B) Asserted Against United and the Plan)**

50. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as

United, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

51. United and the Plan failed to provide coverage for C.K.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

52. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

53. The denial letters produced by United do little to elucidate whether United conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. United failed to substantively respond to the issues presented in Roman's appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

54. For instance, Angela repeatedly noted that the Optum wilderness policy United claimed to have relied on was inapplicable as it explicitly stated that it was intended to be applied to services billing a different revenue code altogether. She also stated that it was superseded by the terms of the individual benefit plan. United made no effort to justify its continued use of these criteria despite Angela's objections.

55. Additionally, United wrote in its February 3, 2023, denial letter that "this facility is not available for authorization." This statement strongly suggests that United has an internal policy blacklisting all treatment at First Light regardless of the provisions of the

14

member's particular benefit plan.

56. As United did not produce the documentation the Plaintiffs requested, it is not apparent the extent to which United's reviewers assessed the claim, or if they simply denied payment without thoroughly reviewing the appeal due to First Light's apparent status as a blacklisted program.

57. United and the agents of the Plan breached their fiduciary duties to C.K. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in C.K.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of C.K.'s claims.

58. The actions of United and the Plan in failing to provide coverage for C.K.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity and facility eligibility criteria.

59. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first, second, and third causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3)
Asserted Against United and the Plan)**

60. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of United's fiduciary duties.

61. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

62. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

63. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, "fail first" requirements, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

64. The medical necessity and facility eligibility criteria used by United for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

65. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for C.K.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

66. When United and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

67. United and the Plan evaluated C.K.'s mental health claims using criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

68. The external reviewer stated that part of their decision to deny payment at First Light was predicated on the absence of C.K. obtaining treatment at the intensive outpatient and partial hospitalization program level of care before being treated at First Light. These "fail-first" requirements are specifically referenced in the Final Rules of MHPAEA as constituting an impermissible nonquantitative treatment limitation.

69. United denied C.K.'s outdoor behavioral health treatment in large part on the basis that it was experimental or investigational. The National Uniform Billing Committee, the organization responsible for developing and issuing revenue codes for services, has assigned wilderness programs their own separate revenue code.

70. Plaintiffs are aware of no analogous medical or surgical facilities which have been assigned such a revenue code that are categorically excluded by United on the basis that they are experimental or investigational.

71. Furthermore, Plaintiffs identified factors in United's criteria (such as the specific revenue codes the criteria listed) which they claimed made these criteria inapplicable to the treatment at issue. On information and belief, United does not deny payment for medical

or surgical care using criteria which state that they are not applicable to the service in question.

72. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and United, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

73. United and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that United and the Plan were not in compliance with MHPAEA.

74. In fact, despite Roman's request that United and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, United and the Plan have not provided Roman with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, United and the Plan have not provided Roman with any information about the results of this analysis.

75. The violations of MHPAEA by United and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

## **THIRD CAUSE OF ACTION**

### **(Request for Statutory Penalties Under 29 U.S.C. §1132(a)(1)(A) and (c) Against the Plan Administrator)**

76. United, acting as agent for the Plan Administrator, is obligated to provide to participants and beneficiaries of the Plan within 30 days after request, documents under which the Plan was established or operated, including but not limited to any administrative service agreements between the Plan and United, the medical necessity criteria for mental health

and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facilities.

77. In spite of Roman and Angela's requests during the appeal process for United to produce the documents under which the Plan was operated, and his instructions to forward that request to the appropriate entity if United was not acting on behalf of the Plan Administrator in this regard, United repeatedly failed to produce to the Plaintiffs the documents under which the Plan was operated, including but not limited to any administrative service agreements between the Plan and United, the medical necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facility treatment within 30 days after they had been requested.

78. After United repeatedly failed to provide these materials, Roman sent one final letter dated April 14, 2024, to both United and the Plan Administrator again requesting the documents which he was statutorily entitled to receive upon request. United and the Plan Administrator did not comply with Roman's request for documents.

79. The failure of the Plan Administrator and its agent United, to produce the documents under which the Plan was operated, as requested by the Plaintiffs, within 30 days of Roman's request for ERISA documents, provides the factual and legal basis under 29 U.S.C. §1132(a)(1)(A) and (c) for this Court to impose statutory penalties against the Plan Administrator up to $110 per day from 30 days from the date of each of these letters to the date of the production of the requested documents.

80. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1.      Judgment in the total amount that is owed for C.K.'s medically necessary treatment at First Light under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.      Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.      For an award of statutory penalties of up to $110 a day against the Plan Administrator after the first 30 days for each instance of the Plan Administrator and its agent United's failure or refusal to fulfill their duties, to provide the Plaintiffs with the documents they had requested.

4.      Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

5.      For such further relief as the Court deems just and proper.

DATED this 31st day of May, 2024.

By ___ s/ Brian S. King _____
     Brian S. King
     Attorney for Plaintiffs


County of Plaintiffs' Residence:
Dekalb County, Georgia